1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| QBEX COMPUTADORAS S.A., | Case No. 17-CV-03375-LHK |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF** |
| v. | |
| INTEL CORPORATION, | |
| Defendant. | Re: Dkt. No. 18 |

Plaintiff Qbex Computadoras S.A. ("Qbex") sues Defendant Intel Corporation ("Intel") for claims arising from Intel's provision of allegedly faulty smartphone microprocessors, which Qbex alleges overheated and sometimes caused the smartphones to catch fire or explode. Before the Court is Intel's motion to dismiss six of Qbex's eight claims for relief and certain of Qbex's prayers for relief. ECF No. 18 ("Mot."). Having considered the submissions of the parties, the relevant law, the parties' arguments at the November 16, 2017 hearing, and the record in this case, the Court GRANTS IN PART and DENIES IN PART Intel's motion to dismiss six of the eight claims for relief and certain prayers for relief.

1

Case No. 17-CV-03375-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

# I.    BACKGROUND

## A.    Factual Background

Intel is a Delaware corporation based in California that "designs, trademarks, manufactures, markets, and sells microprocessors."  Complaint ("Compl."), ECF No. 1, ¶ 12.

Qbex is a Brazilian company that sells consumer electronics.  *Id.* ¶¶ 11, 17-18.  Qbex began selling electronics in Brazil in 2003.  *Id.* ¶ 18.  In 2005, Qbex began selling desktop computers.  *Id.* ¶ 20.  In 2008, Qbex desktops were recognized among the "most reliable" computers in Brazil.  *Id.* ¶ 21.  In 2012 and 2013, Qbex was listed among the top ten desktop vendors in Brazil.  *Id.*  Qbex began selling laptop computers in 2010.  *Id.* ¶ 20.  In 2013, Qbex began selling tablets.  *Id.*  By September 2015, Qbex's TX300 tablet was the second most sold tablet in Brazil.  *Id.* ¶ 24.  Between 2005 and 2012, Qbex's revenues increased from roughly $1,300,000 to $85,000,000 per year.  *Id.* ¶ 22.

### 1.    Development of the Intel-Qbex Smartphone Deal

In January 2015, Alessandra Souza, an Intel executive representative in Brazil who was in charge of the Qbex account, approached Joabe Fonseca, the president of Qbex, about the possibility of launching Intel's line of smartphones in Brazil under the Qbex brand.  *Id.* ¶ 25.  The smartphones would feature Intel's SoFIA microprocessor and mobile platform.  *Id.* ¶ 26.

On February 27, 2015, Souza sent Fonseca catalogs of Intel's original design manufacturers ("ODMs") that would provide the Intel smartphone hardware to Qbex.  *Id.* ¶ 29.  Qbex explains that U.S. technology companies design products and then outsource the manufacturing of those products to ODMs.  *Id.* ¶ 30.  Water World Technology Co. Ltd. ("Water World") in China would be the ODM for the motherboard and internal systems of the smartphones.  *Id.* ¶ 31.  Fuzhou Rockchip Electronics Co. Ltd. ("Rockchip") was the ODM for the SoFIA microprocessors.  *Id.* ¶ 32.  Fortune Ship Technology (HK) Limited ("Fortune Ship"), I-Swim Technology Company Limited ("I-Swim"), and HK Tianruixiang Communication Equipment Limited ("HK Tianruixiang"), all based in China or Hong Kong, were the system

2

integrators for the smartphone parts.  *Id.* ¶ 31.  Souza told Fonseca that Intel was responsible for the design and quality of the products and that Intel had supervising technicians working at its ODM and system integrator partners' factories to ensure compliance with Intel's standards and designs.  *Id.* ¶ 33.

Fonseca attended Intel's Solutions Summit for Latin America (the "ISS Conference") on April 22, 2013.  *Id.* ¶ 34.  At the ISS Conference, Fonseca met with Intel's vice president and sales and marketing group general manager for Latin America, Steve Long.  *Id.* ¶ 35.  During the meeting with Long, Fonseca agreed on behalf of Qbex to launch the Intel smartphones under the Qbex brand.  *Id.*

On June 5, 2015, Marcelo Pinheiro of Intel sent Fonseca a presentation about the SoFIA microprocessor and Intel's mobile platform.  In this presentation, Intel represented that its SoFIA microprocessor performed better than the microprocessors produced by Intel's competitors MediaTek and Qualcomm.  *Id.* ¶ 37.  Based on this presentation, Fonseca confirmed Qbex's decision to launch Intel's smartphones rather than Qualcomm's smartphones.  *Id.* ¶¶ 37-38.

Qbex contends that the contractual relationship between Intel and Qbex was governed by a range of written agreements that Qbex refers to as the "umbrella agreements."  *Id.* ¶¶ 39, 48.  The umbrella agreements included a Technology Provider Program Agreement ("Provider Agreement"), a Channel Trademark License Agreement, and separate Price Matching Agreements.  *Id.* ¶¶ 40, 47.  Qbex contends that the umbrella agreements "were supplemented or expanded by oral and written communications regarding the number of units that Qbex agreed to purchase and that Intel agreed to provide to Qbex from its ODMs."  *Id.* ¶ 48.

In preparation for the launch of the smartphones, Qbex invested more than $130,000 and eventually shifted more than 90% of its capacity to the assembly, marketing, and sale of the Intel smartphones.  *Id.* ¶ 53.  Qbex also hired more than 200 new employees for the Intel smartphone business.  *Id.*  Qbex began to sell the Intel smartphones in October 2015.  *Id.* ¶ 55.  Between October 2015 and December 2016, Qbex sold (or distributed) 235,074 units.  *Id.* ¶ 57.

United States District Court
Northern District of California

### 2. The Overheating Problems

Qbex contends that the Intel microprocessor "and/or mobile system had a design defect that caused the [smartphone] to overheat and even explode." *Id.* ¶ 58. As a result of the defect, there were 2 reported incidents of malfunction in December 2015, 43 smartphone returns or complaints in January 2016, 79 returns or complaints in February 2016, and 219 returns or complaints in March 2016. *Id.* ¶ 70. In April 2016, there were 401 complaints or returns; in May 2016, there were 915 complaints or returns; and in June 2016 there were 1,446 complaints or returns. *Id.* ¶ 75. There were 9,090 complaints or returns in July 2016 and 5,962 complaints or returns in August 2016. *Id.* ¶ 86. In total, Qbex alleges it received more than 35,000 customer complaints related to the alleged design defect in the SoFIA microprocessor. *Id.* ¶ 91.

Qbex explains that as part of its quality control procedures, Qbex tested the performance of smartphone samples it received from the ODMs before beginning its own mass production of the phones. *Id.* ¶ 64. "While performing these tests, Qbex's engineering team noted that the temperature of the Intel [s]martphones was higher than the temperature of other comparable electronics." *Id.* ¶ 65.

In an email dated December 12, 2015, Raul Miranda of Qbex's engineering team reported the overheating problem to Fortune Ship officials and attached a copy of a Qbex engineering report showing a performance temperature of 44 degrees Celsius. *Id.* ¶¶ 66-67; Exh. E. On December 14, 2015, Raymond Zou of Fortune Ship responded that "the maximum temperature 44 degree[s] Celsius should be accepted. For Intel SoFia 3G platform, the power consumption is a little higher than other platform." Compl. ¶ 68; Exh. E. Qbex raised the overheating issue with Souza, who represented to Qbex that Intel would review the issue with Fortune Ship. Compl. ¶ 69. Qbex contends that Souza's response was misleading because Intel and Fortune Ship had already determined by October 2015 that the smartphones tended to overheat. *Id.* ¶¶ 59, 69.

Qbex alleges that between February and April 2016, Intel officials conveyed satisfaction with the sales of the Intel phones in the Brazilian market and optimism about the future of the

SoFIA platform. *Id.* ¶¶ 72-76. On April 29, 2016, however, Intel announced that it was canceling the production of the SoFIA microprocessor. *Id.* ¶ 77. Intel represented to Qbex that this decision was a result of business restructuring, not because of any problem with the microprocessor. *Id.*

At the May 2016 ISS Conference, Fonseca met with Souza, Long, and Vice President and General Manager of Global Accounts CJ Bruno. *Id.* ¶ 79. During that meeting, Bruno "agreed on behalf of Intel to sell to Qbex through Intel's ODMs 970,000 smartphone units to cover the market demand through the second quarter of 2017." *Id.* ¶ 81. Qbex contends that Intel "further agreed to provide technical support to Qbex and its customers through, at least, the second quarter of 2017." *Id.* ¶ 83. This agreement was memorialized in an email dated May 19, 2016. *Id.* ¶ 84; Exh. G.

At some point, Qbex heard rumors that Intel fired all the engineers in charge of the SoFIA microprocessors and that the ODMs could not solve the overheating problems without Intel's engineers. Compl. ¶ 87. Qbex eventually "confirmed through an independent study that a design defect in Intel's SoFIA microprocessor" was indeed the cause of the smartphones' overheating problems. *Id.* ¶ 88. In December 2016, Qbex terminated its relationship with Intel and stopped selling the Intel smartphones. *Id.* ¶ 89.

### 3. Qbex's Damages Contentions

Qbex contends that it has suffered damages as a result of the defective SoFIA microprocessors including but not limited to the loss of its investment in the smartphone expansion, the loss of goodwill and reputation, and the loss of expected profits on the sale of the smartphones that Intel agreed to supply through the second quarter of 2017. *Id.* ¶ 90. In addition, Qbex alleges that it hired 216 additional employees to manage customer complaints and related lawsuits. *Id.* ¶ 91. Moreover, Qbex has agreed to exchange more than 18,000 defective smartphones and has resolved or settled numerous administrative and judicial complaints. *Id.* Finally, Qbex is currently storing 13,518 smartphones that it cannot sell, in addition to 20,000 units held in customs in Brazil and 10,000 units in storage at the ODM factories in Hong Kong. *Id.* ¶ 92.

United States District Court
Northern District of California

**B.      Procedural History**

Qbex filed the instant complaint on June 12, 2017.  Compl.  The complaint alleges eight causes of action under Delaware law: (1) common law fraud; (2) violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2513; (3) common law negligent misrepresentation; (4) breach of the implied warranty of merchantability, 6 Del. Code § 2-314; (5) common law breach of the covenant of good faith and fair dealing; (6) common law unjust enrichment; (7) common law civil conspiracy; and (8) breach of contract.  Compl. ¶¶ 95-142.

On August 3, 2017, Intel filed an administrative motion stating its intention to move to dismiss six of Qbex's eight causes of action and seeking an order that the deadline for Intel to respond to the other two causes of action would be fourteen days after the Court's ruling on its motion to dismiss.  ECF No. 17.  On August 4, 2017, Intel filed the instant motion to dismiss Qbex's first, second, third, fifth, sixth, and seventh causes of action, as well as Qbex's prayers for treble damages, punitive damages, and attorneys' fees.  ECF No. 18.

On August 7, 2017, Qbex opposed Intel's administrative motion to set the deadline for Intel's response to the other two causes of action not subject to the motion to dismiss.  ECF No. 19.  On August 15, 2017, the Court granted Intel's administrative motion.  ECF No. 20.  The Court ruled that if the Court denies Intel's motion to dismiss, Intel must answer the complaint within fourteen days of the Court's resolution of the motion to dismiss.  If the Court grants Intel's motion to dismiss, Intel must file a responsive pleading within twenty-one days after service of the amended complaint.  *Id.* at 2.

On August 18, 2017, Qbex filed an opposition to the motion to dismiss.  ECF No. 21 ("Opp.").  On August 25, Intel filed a reply.  ECF No. 31 ("Reply").  The Court held a hearing on the motion to dismiss on November 16, 2017.

## II.      LEGAL STANDARD

**A.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

Case No. 17-CV-03375-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, a court need not accept as true allegations contradicted by judicially noticeable facts, *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and the "[C]ourt may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into one for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor is the Court required to assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

**B.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 9(b)**

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be stated with particularity. Specifically, the Ninth Circuit has held that averments of fraud "be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

United States District Court
Northern District of California

1997)).  When an "entire claim within a complaint[] is grounded in fraud and its allegations fail to

satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the . . .

claim."  *Id.* at 1107.  The Ninth Circuit has recognized that "it is established law in this and other

circuits that such dismissals are appropriate," even though "there is no explicit basis in the text of

the federal rules for the dismissal of a complaint for failure to satisfy 9(b)."  *Id.*  A motion to

dismiss a complaint "under Rule 9(b) for failure to plead with particularity is the functional

equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim."  *Id.*

## C.     Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

decision on the merits, rather than on the pleadings or technicalities."  *Lopez v. Smith*, 203 F.3d

1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted).  However, a court "may exercise its

discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

to the opposing party . . . , [and] futility of amendment.'"  *Carvalho v. Equifax Info. Servs., LLC*,

629 F.3d 876, 892-93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S.

178, 182 (1962)).

## III.    DISCUSSION

Intel argues that six of Qbex's causes of action should be dismissed either for failure to

comply with Federal Rule of Civil Procedure 9(b) or because they fail as a matter of Delaware

law.  The Court addresses Intel's arguments in turn below.

## A.     Qbex's First Cause of Action for Common Law Fraud Fails to Satisfy Rule 9(b)

### 1.     The Parties' Arguments

Qbex's first cause of action is for common law fraud under Delaware law.  Qbex alleges

that Intel represented that its SoFIA microprocessors were high quality microprocessors that

would function not only for their intended purpose, but better than Intel's competitors'

8

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR
RELIEF AND CERTAIN PRAYERS FOR RELIEF

United States District Court
Northern District of California

microprocessors. Compl. ¶ 96. Qbex contends that it relied on these representations in agreeing to sell the Intel smartphones under the Qbex brand. *Id.* ¶¶ 99-100. Qbex alleges that these representations were false because Intel knew or should have known that the SoFIA microprocessors were defective. *Id.* ¶ 98. Qbex alleges that it suffered more than $100 million in damages as a result of Intel's fraudulent misrepresentations. *Id.* ¶ 101.

Intel argues that Qbex's common law fraud cause of action fails because it does not plead with sufficient particularity what damages are attributable to the alleged fraud. Mot. at 8. Specifically, Intel argues that Qbex fails to distinguish between damages attributable to fraud and damages attributable to breach of contract. *Id.* at 8-9. Qbex counters that its fraud claims arise from Intel's fraudulent inducement of Qbex at the outset of their smartphone partnership, whereas its contract claims arise from the May 2016 agreement for Intel to provide additional smartphones and technical support. Opp. at 4-5. As such, Qbex argues that the fraud-related damages it seeks are out-of-pocket expenses preparing for the launch of the smartphone business, lost goodwill, lost profits, and lost customers. *Id.* at 5. Qbex states that its contract-related damages are expectation damages resulting from Intel's failure to deliver the promised products and technical support. *Id.* Intel responds that Qbex's complaint does not draw the same distinctions as Qbex's opposition and so the common law fraud cause of action must be dismissed. Reply at 1-2.

## 2. Analysis

Federal courts deciding state law fraud claims look to state law for the elements of a fraud claim but also apply Rule 9(b)'s heightened pleading standard.[1] *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). "The general elements of common law fraud under Delaware law are: (1) defendant's false representation, usually of fact, (2) made either with knowledge or belief or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction resulted from a reasonable reliance on the

---

[1] Even if this were not the case, Delaware courts apply their own equivalent of Rule 9(b). *See Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990).

representation, and (5) reliance damaged the defendant." *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990). When a plaintiff asserts both fraud and breach of contract claims, the plaintiff must identify what damages are attributable to the fraud and what damages are attributable to the breach of contract. *See Wayne Merritt Motor Co. v. N.H. Ins. Co.*, No. 11-CV-01762-LHK, 2011 WL 5025142, at *12 (N.D. Cal. Oct. 21, 2011). Delaware law requires the same distinction: "[A] plaintiff's fraud claim 'may not simply rehash the damages allegedly caused by the breach of contract.'" *Khushaim v. Tullow Inc.*, No. N15C-11-212-PRW, 2016 WL 3594752, at *6 (Del. Super. Ct. June 27, 2016) (quoting *ITW Glob. Invs. v. Am. Indus. Partners Capital Fund IV, L.P.*, No. N14C-10-236 JRJ CCLD, 2015 WL 3970908, at *5 (Del. Super. Ct. June 24, 2015)). Thus, whether cast as a Rule 9(b) issue or as a question of the damages element of Delaware common law fraud, a plaintiff must "separate the damages incurred by any alleged fraudulent conduct from those incurred by any alleged breach of contract." *Id.*; *see also Wayne Merritt Motor Co.*, 2011 WL 5025142 at *12.

Although Qbex attempts to separate its fraud-related damages from its contract-related damages in its opposition, the relevant question is whether Qbex's complaint draws the distinction with the particularly that Rule 9(b) requires. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."). The Court concludes that Qbex's fraud claim does not satisfy Rule 9(b). The damages contentions in Qbex's complaint attribute all damages to "the design defect in the SoFia microprocessors." Compl. ¶¶ 90-91. In its complaint, Qbex does not distinguish what types of damages are attributable to fraud.

Nor does Qbex's complaint clearly distinguish the amount of damages attributable to fraud. Qbex's complaint asserts that Intel's fraud caused damages of "not less than $100 million, as more fully set forth above." *Id.* ¶ 101. Qbex's complaint asserts the same amount of damages, using the same phrasing, for its common law negligent misrepresentation cause of action, its

10

United States District Court
Northern District of California

breach of the implied warranty of merchantability cause of action, and its common law breach of the covenant of good faith and fair dealing cause of action. *Id.* ¶¶ 113, 120, 126. It is thus unclear from the complaint whether Qbex asserts that its total damages for all causes of action are not less than $100 million—in which case it has failed to designate what amount is attributable to the fraud—or whether it asserts damages of not less than $100 million for each cause of action.

Intel argues that the Court should not give Qbex leave to amend its common law fraud cause of action because such amendment would be futile. Reply at 2-3. Specifically, Intel argues that Qbex's fraud claim, as clarified in Qbex's opposition, fails to plead reliance. *Id.* As Qbex explains in its opposition, its fraud claim relates to Qbex's 2015 decision to sell Intel smartphones. Intel argues, however, that Qbex's complaint fails to identify any misrepresentations that predate Qbex's April 2015 decision to sell Intel smartphones. *Id.* at 3. Intel is correct that, as currently pled, the complaint fails to identify any specific Intel misrepresentations about the quality of Intel's SoFIA microprocessor that predate Qbex's decision to sell the smartphones. However, because Qbex could amend its complaint both to allege earlier misrepresentations and to specifically plead damages attributable to fraud, Intel's motion to dismiss Qbex's first cause of action for common law fraud is GRANTED with leave to amend.

**B.** **Qbex's Second Cause of Action for Violation of the Delaware Consumer Fraud Act Fails to Plead that Any Relevant Act Occurred in Delaware, and Qbex Cannot Plead California Law Claims in the Alternative Because the Delaware Choice of Law Clause is Enforceable**

### 1. The Parties' Arguments

Qbex's second cause of action is for violation of the Delaware Consumer Fraud Act ("DCFA"), 6 Del. Code § 2513. Qbex alleges that the Provider Agreement has a choice of law clause stating that "the applicable law shall be that of the State of Delaware, without reference to conflicts of law principles." Compl. ¶ 104. Qbex contends that Intel used "deception, fraud, false pretenses, false promises, misrepresentations, or the concealment, suppression, or omission of a material fact" in connection with the sale of its SoFIA microprocessors. *Id.* ¶ 105. Intel allegedly

did so with the intent to induce others, including Qbex, to rely on its misrepresentations to further Intel's sales. *Id.* ¶ 106.

Intel contends that Qbex's statutory fraud claim fails because Qbex fails to allege that any relevant conduct took place in Delaware, as required by the statute to state a claim. Mot. at 9-10. Qbex responds that dismissing the claim on this ground would allow Intel to insulate itself from liability based on all statutory fraud claims, given the facts and the parties' selection of Delaware law. Opp. at 9. In the alternative, Qbex requests leave to amend to allege a claim under California's Unfair Competition Law ("UCL") or California's Consumer Legal Remedies Act ("CLRA"). *Id.* at 9-10. Intel replies that a choice of law clause generally governs all claims between the parties and so Qbex should not be allowed to depart from the choice of Delaware law when Delaware law is unfavorable to its position. Reply at 7-8. Moreover, Intel argues that California's choice of law principles favor the application of Delaware law in this instance. *Id.* at 8-9.

### 2. Analysis

The parties do not dispute that the Provider Agreement contained a choice of law provision selecting Delaware law without reference to choice of law principles. *See* Compl. ¶ 104; Reply at 6-7; Exh. B ¶ 10.9. Section 2512 of the Delaware Code states that the purpose of the DCFA is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State." 6 Del. Code § 2512. Section 2513, in turn, prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." *Id.* § 2513(a).

In *Wal-Mart Stores, Inc. v. AIG Life Insurance Co.*, 901 A.2d 106 (Del. 2006), Wal-Mart, a Delaware corporation, sued AIG, also a Delaware corporation, alleging violation of the DCFA

among other causes of action. The Delaware Supreme Court held that the DCFA claim should be dismissed because the complaint "d[id] not allege that any of the conduct at issue took place in Delaware," as required by § 2512. 901 A.2d at 117. Qbex's complaint does not allege that any relevant conduct took place in Delaware, nor does Qbex argue that it could amend the complaint to so allege. Rather, Qbex argues that the parties' choice of Delaware law somehow overrides the DCFA's requirement that some relevant conduct take place in Delaware. *See* Opp. at 9. Qbex cites nothing directly on point in support of this argument,[2] nor is the Court aware of any authority that would support the idea that the parties' selection of a given state's law would alter the substance of that law or change how it applies to the parties. Indeed, other courts applying Delaware law based on a contract's choice of law provision have enforced the DCFA's requirement that some relevant conduct take place in Delaware. *See Market Am., Inc. v. Google, Inc.*, No. 09-494-GMS, 2011 WL 1485616, at *3-4 (D. Del. Apr. 19, 2011) (concluding that Delaware law applies based on choice of law provision and dismissing DCFA claim for failure to allege acts took place in Delaware). Accordingly, Intel's motion to dismiss the DCFA cause of action is GRANTED.

Qbex did not argue in its opposition that it could amend its DCFA claim to plead that any acts occurred in Delaware, nor could Qbex identify any acts occurring in Delaware when asked at the November 16, 2017 hearing. Indeed, Qbex's arguments—that Qbex should be allowed to state a claim notwithstanding the lack of acts in Delaware, or in the alternative that it be allowed to plead claims under California law—strongly suggest that Qbex will be unable to plead the

---

[2] The Delaware cases Qbex cites did not ignore the requirement to plead acts in Delaware, but rather applied another state's law instead of Delaware law after performing a choice of law analysis, *see Millett v. Truelink*, No. CIV. 05-599 SLR, 2006 WL 2583100 (D. Del. Sept. 7, 2006), or dismissed a DCFA claim on other grounds, *see Jamgochian v. Prousalis*, 2000 WL 1610750 (Del. Super. Ct. Aug. 31, 2000). While *Hall v. Sprint Spectrum L.P.*, 876 N.E.2d 1036 (Ill. App. Ct. 2007) does support Qbex's argument, the Court notes that (1) *Hall* is an Illinois court interpreting Illinois law, and (2) another district of the Appellate Court of Illinois has disagreed with *Hall*'s holding after finding its reasoning unpersuasive. *See Int'l Profit Assocs., Inc. v. Linus Alarm Corp.*, 971 N.E.2d 1183, 1191-92 (Ill. App. Ct. 2012). As such, this Court does not find *Hall* persuasive.

Case No. 17-CV-03375-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

required connection to Delaware if allowed leave to amend. Accordingly, because amendment would be futile, the Court dismisses the DCFA claim with prejudice. *See Carvalho*, 629 F.3d at 892-93.

Qbex argues in the alternative that it should be allowed leave to amend to allege a claim under California law. Opp. at 10. Qbex contends that it would offend California public policy to allow Intel to insulate itself from statutory consumer protection claims by enforcing the Delaware choice of law provision in this instance. *Id.* Qbex's argument is not persuasive, and a court in this district has rejected the exact same argument. In *Medimatch, Inc. v. Lucent Technologies Inc.*, 120 F. Supp. 2d 842 (N.D. Cal. 2000), the plaintiffs conceded that their contract contained a clause selecting New Jersey law. *Id.* at 861. Nevertheless, the plaintiffs argued that "should the Court find that Plaintiffs have no remedy under New Jersey law, Plaintiffs should be free to pursue their claim under [the California UCL]." *Id.* The court found that "Plaintiffs' position is clearly untenable, and defendants correctly label it a 'heads I win, tails you lose' argument." *Id.* The court went on, "The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Id.* at 862 (citing *Wong v. Tenneco*, 702 P.2d 570 (Cal. 1985)).

Indeed, "[w]hen two sophisticated, commercial entities agree to a choice-of-law clause like the one in this case, the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148, 1153 (Cal. 1992). In other words, as a commercially sophisticated company, Qbex can be assumed to have understood the tradeoffs inherent in agreeing to a Delaware choice of law clause. It should not be allowed to escape the consequences of its agreement to apply Delaware law simply because it is now unable to state certain statutory claims under Delaware law. *See Medimatch*, 120 F. Supp. 2d at 862.

Moreover, a choice of law analysis confirms that the choice of Delaware law is

14

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

enforceable. "Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations." *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008). "In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions." *ABF Capital Corp. v. Osley*, 414 F.3d 1061, 1065 (9th Cir. 2005) (quoting *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 46 Cal. Rptr. 2d 33 (Ct. App. 1995). A threshold question in this analysis is whether "the chosen state has a substantial relationship to the parties or their transaction." *Hoffman*, 546 F.3d at 1082 (quoting *Nedlloyd Lines*, 834 P.2d at 1152). Here, Intel's incorporation in Delaware provides a substantial basis for choosing that state's law. *See Nedlloyd Lines*, 834 P.2d at 1153.

At the next step of the choice of law analysis, Qbex bears the burden of showing that enforcing the Delaware choice of law provision here would be contrary to a fundamental policy of California. *See Hoffman*, 546 F.3d at 1082; *Palomino v. Facebook, Inc.*, 2017 WL 76901, at *3 (N.D. Cal. Jan. 9 2017) (assigning burden to party challenging enforceability of choice of law provision in California choice of law analysis). Qbex identifies the fundamental California policy at issue here as California's interest in protecting consumers. Opp. at 10 (citing *Walter v. Hughes Commc'ns, Inc.*, 682 F. Supp. 2d 1031 (N.D. Cal. 2010)). However, Qbex—a sophisticated commercial entity based in Brazil, not California—has not shown that it is the type of consumer that California's consumer protection statutes were designed to protect. *See Brazil v. Dell, Inc.*, 585 F. Supp. 2d 1158, 1166 (N.D. Cal. 2008) (characterizing the public policy behind California's UCL and CLRA as "[p]rotection of unwary consumers from being duped by unscrupulous sellers." (quoting *Vasquez v. Superior Court*, 484 P.2d 964 (Cal. 1971)). Nor has Qbex argued that Delaware's consumer protection statutes are generally offensive to California public policy. As the court in *Medimatch* reasoned, the mere fact that a Delaware statute provides less protection than a California statute in this particular instance does not offend California public policy generally. 120 F. Supp. 2d 862. To the contrary, the California Supreme Court has stated that

15

California law "reflect[s] strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses." *Nedlloyd Lines*, 834 P.2d at 1149. As such, the Court concludes that Qbex has not shown that enforcing the Delaware choice of law clause would offend a fundamental policy of California. Nor has Qbex shown that California's interest in protecting consumers in Brazil outweighs its interest in enforcing a Delaware choice of law clause negotiated by two sophisticated companies, one of which is incorporated in Delaware. *See Wissot v. Great-West Life & Annuity Ins. Co.*, 619 F. App'x 603, 605 (9th Cir. 2015) (unpublished) (holding that district court did not err when California's interest in applying certain rule did not outweigh California's interest in enforcing choice of law provision and Illinois's interest in seeing its substantive law applied to a contract made by an entity domiciled in Illinois).

Accordingly, the Court finds that the Delaware choice of law provision is enforceable. As such, Qbex's request for leave to allege causes of action under the California UCL or CLRA is DENIED.

## C. Delaware's Economic Loss Doctrine Bars Qbex's Common Law Negligent Misrepresentation Claim, and the Information Supplier Exception Does Not Apply

### 1. The Parties' Arguments

Qbex's third cause of action is for common law negligent misrepresentation,[3] a tort. Qbex alleges that Intel knew or should have known that Qbex was relying on Intel's representations about the superior quality and fitness of Intel's SoFIA microprocessors. Compl. ¶ 109. With the exercise of reasonable care, however, Intel should have known that the SoFIA microprocessors were defective. *Id.* ¶ 111. Qbex alleges that it acted reasonably in relying on Intel's

---

[3] It appears that at least some Delaware courts draw a distinction between negligent misrepresentation, a claim based in equity, and negligence (or negligent provision of information). *See, e.g.*, *State Dep't of Transp. v. Figg Bridge Eng'rs, Inc.*, No. S11C-01-031 RFS, 2011 WL 5593163, at *4 (Del. Super. Ct. Nov. 9, 2011) (distinguishing between negligent misrepresentation and negligent provision of information); *Atwell v. RHIS, Inc.*, No. 02C-12-003WLW, 2006 WL 2686532, at *1 (Del. Super. Ct. Aug. 18, 2006) (same). To the extent this distinction makes any difference to the Court's consideration of Qbex's claim, the Court will construe it as a claim for negligence, which these Delaware courts have explained is the proper characterization of a claim premised on § 552 of the Restatement (Second) of Torts like Qbex's.

16

1  representations when it agreed to the deal to sell Intel's smartphones. *Id.* ¶ 112.

2      Intel argues that Qbex's negligent misrepresentation claim is barred by Delaware's

3  economic loss doctrine, Mot. at 5, which "prohibits certain claims in tort where overlapping

4  claims based in contract adequately address the injury alleged," *Brasby v. Morris*, No. C.A. 05C-

5  10-022-RFS, 2007 WL 949485, at *6 (Del. Super. Ct. Mar. 29, 2007). In such cases, the plaintiff

6  must seek to recover under contract law. *Id.* Qbex responds that its claim falls within an

7  exception to the economic loss doctrine for defendants whose business is based on supplying

8  information. Opp. at 6. Qbex also contends that courts typically address the applicability of the

9  economic loss doctrine at the summary judgment stage because of the inquiry's fact-intensive

10  nature. *Id.* Intel replies that the information supplier exception does not apply because Intel's

11  business is primarily the supply of physical goods and any supply of information is incidental.

12  Mot. at 6-8; Reply at 3-6.

13      **2.  Analysis**

14      "The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort

15  where a product has damaged only itself (*i.e.*, has not caused personal injury or damage to *other*

16  property) and, the only losses suffered are economic in nature." *Danforth v. Acorn Structures,*

17  *Inc.*, 608 A.2d 1194, 1195 (Del. 1992). "The rationale underlying the economic loss doctrine is

18  best understood by considering the distinct functions served by tort law and contract law." *Id.*

19  Tort law protects the individual and his property from dangerous products, while contract law

20  protects the "bargained for expectations" of parties who suffer losses when a product is unfit for

21  its intended use. *Id.* at 1196. The Delaware Supreme Court has held that "the economic loss

22  doctrine is especially suited to cases where privity of contract does exist," because "it is presumed

23  that the parties to the transaction have allocated the risk of product nonperformance through the

24  bargaining process." *Id.* at 1200.

25

26

27

28

Case No. 17-CV-03375-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

In the instant case, Qbex does not allege physical injury or injury to other property.[4] Rather, Qbex asserts lost investment, lost goodwill and reputation, lost profits, and expenses associated with handling customer complaints and lawsuits. Compl. ¶¶ 90-91. As a result, Qbex's negligent misrepresentation claim is barred by the economic loss doctrine unless the information supplier exception applies.

In *Guardian Construction Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1376 (Del. Super. Ct. 1990), the court adopted § 552 of the Restatement (Second) of Torts, also referred to as the information supplier exception, as an exception to the economic loss doctrine. *Id.* at 1386. Section 552 provides, in relevant part, that "[o]ne who, in the course of his business . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care . . . in obtaining or communicating the information." Restatement (Second) of Torts § 552(1) (1977). To qualify for the information supplier exception, "a plaintiff must prove: 1) defendant supplied the information to plaintiff for use in business transactions with third parties; and 2) defendant is in the business of supplying information." *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 519, 527 (D. Del. 2012).

"To determine whether a defendant is in the business of supplying information, a court must conduct a case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted." *Id.* (quoting *RLI Ins. Co. v. Indian River School Dist.*, 556 F. Supp. 2d 356, 361-62 (D. Del. 2008)). Delaware courts have found a defendant in the business of supplying information when information is "the end and aim of the transaction." *Guardian Constr. Co.*, 583 A.2d at 1386; *see also Del. Art Museum v. Ann Beha Architects, Inc.*, No. 06-481

---

[4] Although Qbex does not argue that the overheating of the microprocessor damaged other property by damaging the smartphone itself, it appears that such an argument would likely fail under Delaware law. *See Delmarva Power & Light v. Meter-Treater, Inc.*, 218 F. Supp. 2d 564, 569-70 (D. Del. 2002) (rejecting argument that "when two separate parts are integrated into one functioning whole, damage to either integrated piece by the other component constitutes damage to 'other property' for which tort recovery is allowed").

United States District Court
Northern District of California

GMS, 2007 WL 2601472, at *2 (D. Del. Sept. 11, 2007) (quoting *Guardian Constr. Co.*). By contrast, "[w]here the information supplied is merely ancillary to the sale of a product," the supplier does not qualify for the exception. *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, 2002 WL 1335360, at *7 (Del. Super. Ct. June 13, 2002) (quoting *Tolan & Son Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288 (Ill. Ct. App. 1999)). In *Christiana Marine*, a Delaware court adopted the Seventh Circuit's explanation of this distinction:

> [A] great many businesses involve an exchange of information as well as of tangible products—manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of these cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.

*Id.* (quoting *Rankow v. First Chi. Corp.*, 870 F.2d 356, 364 (7th Cir. 1989)).

Although "the question[] of when a business crosses the line into supplying information . . . ha[s] not been definitively resolved," courts have characterized Delaware's application of the economic loss doctrine as "strict," *Millsboro Fire Co. v. Constr. Mgmt. Servs., Inc.*, No. 05C-06-137 MMJ, 2006 WL 1867705, at *3 (Del. Super. Ct. June 7, 2006) (internal quotation marks omitted), and the information supplier exception as "narrow," *Kuhn Constr. Co.*, 844 F. Supp. 2d at 527. Indeed, the court in *Millsboro Fire* stated that "[i]n Delaware, only surveyors and those expressly in the business of supplying information such as accountants, financial advisors, and title searchers, can be liable in tort for purely economic losses." 2006 WL 1867705 at *3.

It is clear from these cases that Intel is not an information supplier for the purposes of the information supplier exception to Delaware's economic loss doctrine. According to the complaint, "Intel designs, trademarks, manufactures, markets, and sells microprocessors." Compl. ¶ 12. The damages in this case stem from an alleged design defect in the SoFIA microprocessors that caused smartphones to overheat and sometimes catch fire or explode. *Id.* ¶¶ 1, 5-6, 90-91. Any information that Intel supplied to Qbex—be it representations about the quality of the microprocessors or technical support—is incidental to the sale of the microprocessors. Clearly,

United States District Court
Northern District of California

Qbex would not have paid Intel for information about its microprocessors alone; the "end and aim" of the transaction between Intel and Qbex was the provision of smartphones containing Intel's microprocessors. *See Christiana Marine*, 2002 WL 1335360 at *7 ("Clearly, Texaco is generally in the business of supplying oil, not information.").

Qbex relies on a recent District of Delaware decision, *Livery Coach Solutions, L.L.C. v. Music Express/East, Inc.*, 245 F. Supp. 3d 639 (D. Del. 2017), but this case does not compel a different result. In *Livery Coach*, Music Express alleged that Livery Coach misrepresented which version of its software it would provide as well as various facts about the software. *Id.* at 645. Without citing to or explaining any of the cases described above that apply Delaware's information supplier exception, the court in *Livery Coach* summarily concluded that "Music Express also adequately pled that Livery is in the business of providing software solutions for limousine companies and, therefore, in the business of supplying information about the software Music Express contracted to use in dealings with its clients." *Id.* at 647. Given the lack of reasoning or citation to authority, the Court does not find *Livery Coach* persuasive. To the contrary, the Court finds that the cases discussed above are more thorough, better reasoned, and better supported by Delaware precedent than *Livery Coach*. Indeed, in contrast to the outcome in *Livery Coach*, the Superior Court of Delaware's decision in *Christiana Marine* specifically suggests that a software seller would not qualify for the information supplier exception. *See* 2002 WL 1335360, at *7 (quoting *Rankow*, 870 F.2d at 364).

Accordingly, Intel's motion to dismiss the negligent misrepresentation cause of action is GRANTED. Although the Court believes that amendment will likely be futile, the Court nevertheless grants Qbex leave to amend because it is conceivable that Qbex could plead facts that would make the economic loss doctrine inapplicable.

**D.    The Court Declines to Dismiss Qbex's Breach of the Covenant of Good Faith and Fair Dealing Claim at this Time**

**1. The Parties' Arguments**

Qbex's fifth cause of action alleges breach of the implied covenant of good faith and fair

20

dealing. Qbex contends that implicit in the contracts, but not set forth in any specific contractual provisions, were Intel's obligations to sell SoFIA microprocessors that were not defective and to continue to provide Qbex with technical support. Compl. ¶¶ 122-24. Qbex alleges that Intel violated these obligations by causing Qbex to be supplied with defective microprocessors and refusing to continue providing technical support. *Id.* ¶ 124.

Intel argues that Qbex's implied covenant claim fails because Qbex also alleges that the contracts between Intel and Qbex expressly cover Intel's obligations, which precludes an implied covenant claim. Mot. at 10. In the alternative, Intel argues that the breadth of Qbex's implied covenant claim violates Delaware courts' conception of the implied covenant remedy as rare. *Id.* at 12. Qbex responds that no contractual provision specified that the microprocessors must be non-defective, nor did any provision specify the precise terms of Intel's technical support. Opp. at 11-12. In addition, Qbex argues that the obligations it seeks to impose are not overbroad, but rather "give[] binding effect to the reasonable inferences of the agreement." *Id.* at 13. Intel replies that Qbex has failed to identify what implied term the Court should read into the contract. Reply at 11. Intel adds that to the extent the parties foresaw the need for non-defective products or continuing technical support, the parties should have bargained for these terms. *Id.* at 12.

### 2. Analysis

"The implied covenant of good faith and fair dealing involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). The Delaware Supreme Court has stated that it "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. "The implied covenant of good faith and fair dealing cannot be employed to impose new contract terms that could have been bargained for but were not." *Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 959 (Del. 2014). "Rather, the implied covenant is used in

21

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

limited circumstances to include 'what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting.'" *Id.* (quoting *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013)).

However, "where the subject at issue is expressly covered by the contract . . . the implied duty to perform in good faith does not come into play." *McCoy v. Chase Manhattan Bank, USA, NA*, 654 F.3d 971, 975 (9th Cir. 2011) (quoting *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992)). "[M]erely repeating the defendant's allegedly improper acts or omissions already the subject of a separate breach of contract claim is insufficient to support a claim for breach of the implied covenant of good faith and fair dealing." *Khushaim*, 2016 WL 3594752 at *4 (quoting *Haney v. Blackhawk Network Holdings, Inc.*, No. 10851-VCN, 2016 WL 769595, at *9 (Del. Ch. Feb. 26, 2016)). Thus, Delaware courts have dismissed claims for breach of the implied covenant of good faith when the claims are based on the same acts as breach of contract claims where the plaintiff fails to identify any gap in the contract's terms that the implied covenant would fill. *See, e.g.*, *id.*; *Fortis Advisors LLC v. Dialog Semiconductor PLC*, No. 9522-CB, 2015 WL 401371, at *4-5 (Del. Ch. Jan. 30, 2015).

However, when the plaintiff identifies an ambiguity or gap that the implied covenant could fill, Delaware courts have permitted plaintiffs to proceed with implied covenant and contract claims pled in the alternative. *See Fortis Advisors*, 2015 WL 401371 at *5 & n.29 (citing *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, No. 6117-VCP, 2011 WL 6793718 (Del. Ch. Dec. 9, 2011) and *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009)); *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, No. 7668-VCN, 2015 WL 394011 (Del. Ch. Jan. 29, 2015); *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, No. N12C-09-094 JTV, 2013 WL 5210255, at *7-8 (Del. Super. Ct. Sept. 4, 2013).

Thus, "[w]hen presented with a claim under the implied covenant, the first step in the analysis is to determine whether there is a gap that needs to be filled." *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, No. 7141-VCL, 2014 WL 2768782, at *17 (Del. Ch. June 12,

22

United States District Court
Northern District of California

2014).  Then, "[t]o state a claim for breach of the implied covenant, a plaintiff must allege: (1) a

specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage."

*Khushaim*, 2016 WL 3594752, at *3.

The Court will first analyze Qbex's implied covenant claim as to the obligation to provide

non-defective products, and then the Court will analyze Qbex's implied covenant claim as to the

obligation to provide continued technical support.

### a.  Implied Duty to Provide Non-Defective Products

Qbex alleges that its contracts with Intel provided for the sale of microprocessors but did

not specify that the microprocessors must be free from defects.  Compl. ¶ 123; Opp. at 11.

Ordinarily, such a claim is covered by the implied warranty of merchantability, which is codified

in Delaware law.  *See* 6 Del. § 2-314; *Reybold Grp., Inc. v. Chemprobe Techs., Inc.*, 721 A.2d

1267, 1269 (Del. 1998) (listing elements for implied warranty of merchantability cause of action,

including product defect).  Indeed, Qbex's fourth cause of action, which Intel has not moved to

dismiss, alleges a breach of the implied warranty of merchantability based on the design defect in

the SoFIA microprocessors.  Compl. ¶ 117.  Qbex has not cited any case, nor is the Court aware of

one, where a court applying Delaware law used the implied covenant of good faith and fair dealing

to read a requirement for the provision of non-defective products into a contract.  Using the

implied covenant in this way may be overbroad.  As Intel points out, "[i]f defectiveness of a

purchased product could give rise to a good faith and fair dealing claim, then any plaintiff

purchasing allegedly defective goods pursuant to a contract could assert such a claim."  Mot. at 13.

Such a result would appear to be inconsistent with the Delaware Supreme Court's insistence that

the implied covenant remedy "is a limited and extraordinary legal remedy."  *Nemec*, 991 A.2d at

1128.  The Court sees no reason to expand such a limited remedy if Qbex can adequately litigate

the same injury pursuant to the implied warranty of merchantability.  However, because Intel has

not yet answered Qbex's implied warranty of merchantability claim and Intel was unable to

commit to a position on the implied warranty claim when asked at the November 16, 2017

23

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR
RELIEF AND CERTAIN PRAYERS FOR RELIEF

hearing, the Court does not believe that it can fully evaluate Qbex's implied covenant claim with respect to non-defective products at this time. Accordingly, although the Court is skeptical that Qbex's implied covenant claim as to non-defective products will be successful under Delaware law, the Court reserves judgment on this issue until it can evaluate the implied covenant claim in the context of Intel's answer to the implied warranty claim. Intel's motion to dismiss the implied covenant of good faith and fair dealing claim as to the provision of non-defective products is therefore DENIED without prejudice.

### b. Implied Duty to Provide Continued Technical Support

With regard to Qbex's second implied covenant claim, which alleges Intel had an implied duty to provide technical support, the Delaware Superior Court's decision in *Alltrista Plastics*, 2013 WL 5210255, is instructive. The Court first summarizes *Alltrista Plastics*, then the Court applies the law to Qbex's second implied covenant claim. In *Alltrista Plastics*, Alltrista (d/b/a Jarden), a maker of plastic containers, contracted with Rockline, a maker of wet wipes, to produce plastic canisters for Rockline to use as wet wipe packaging. *Id.* at *1. Specifically, the parties entered a supply agreement whereby Jarden agreed to build a tool that Rockline could use to manufacture the canisters. *Id.* at *2. Rockline would pay Jarden upon validation of the tool. *Id.* The tool that Jarden delivered did not produce canisters that met Rockline's specifications. *Id.* Rockline requested information from Jarden to help determine the cause of the canisters' failures, but Jarden never responded. *Id.* at *2, *7. Rockline alleged that Jarden's "failure to assist Rockline in determining the reasons why the canisters failed" was a breach of the implied covenant of good faith and fair dealing. *Id.* at *7.

Jarden moved to dismiss the implied covenant claim because Rockline "simply alleged a breach of the express terms of the Supply Agreement." *Id.* Rockline countered that the implied covenant of good faith and fair dealing "required Jarden to work with Rockline to determine the reasons why the canisters failed so that the failures would not be repeated. It further contend[ed] that Jarden violated the spirit of the Supply Agreement, because Jarden withheld information

24

about the composition of the canisters and refused to work with Rockline to identify the cause of the canisters' failures." *Id.* Because the express terms of the supply agreement did not address such an exchange of information, Rockline argued that its implied covenant claim should survive. *Id.*

The Delaware Superior Court found that Rockline had stated a claim for breach of the implied covenant of good faith and fair dealing. Specifically, the Superior Court found that the supply agreement expressly required Rockline and Jarden to work together to reach agreed upon specifications with regard to the canisters, but "[t]hat provision does not squarely address Rockline's alleged implied obligation here—*i.e.*, that Jarden and Rockline would work together to determine why the canisters failed." *Id.* at 8. Because the contract lacked specific language governing the implied obligation at issue, the Delaware Superior Court denied Jarden's motion to dismiss. *Id.*

In the instant case, Qbex alleges that its contracts required Intel to provide technical support. Specifically, Qbex alleges that in May 2016, Qbex and Intel agreed that Intel would provide technical support to Qbex through at least the second quarter of 2017 and that this agreement was memorialized in emails that Qbex attaches to the complaint as Exhibit G. Compl. ¶¶ 83-84. For example, a May 18, 2016 email from Intel official Ricardo Ferraz states, "[r]egarding Qbex, the decisions up to now: Decision – technical support confirmed by M. Wittman for 3G thru WW/FS to Qbex thru 1H '17." Exh. G. at 5. Intel official Eric Kuwabara forwarded Ferraz's email to Qbex's president on May 19, 2016, with a note that said, "As we discussed, you can relax regarding SoFIA supply and rebate." *Id.*

Intel argues that because this agreement specifically provided for technical support, Qbex cannot pursue an implied covenant claim for failure to provide technical support. However, Qbex argues that the May 2016 contract does not clarify what Intel's precise obligations were with regard to technical support. Qbex contends that the contract impliedly obligated Intel "to continue to provide Qbex with technical support directly or to facilitate technical support through its ODM

25

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

partners to resolve or minimize issues with the SoFia microprocessors." Compl. ¶ 124. "Instead, after designing and causing Qbex to be supplied a defectively designed product, and further inducing Qbex to invest more capital into the SoFia microprocessor product line, Intel abandoned its obligations to Qbex including its obligation to provide such additional technical support." *Id.*

Drawing inferences in the light most favorable to Qbex, as the Court must, the Court concludes that Qbex has identified a contractual gap, specified the implied obligation that would fill that gap, and alleged a breach of that obligation sufficient to state an implied covenant claim.

First, with regard to the contractual gap, the May 2016 emails confirm Intel's intent to provide technical support, but the emails do not specify the meaning of technical support, nor has Intel identified a more specific contractual provision governing technical support that would clarify the parties' understanding of the term. Qbex has thus identified a gap that needs to be filled. *See Alltrista Plastics*, 2013 WL 5210255 at *7-8 (finding that agreement lacked specific language governing the implied obligation at issue).

Second, Qbex has identified the implied obligation that should be read into the contract. Qbex argues that the May 2016 agreement, although not specific, created an obligation for Intel to "continue to provide Qbex with technical support directly or to facilitate technical support through its ODM partners to resolve or minimize issues with the SoFia microprocessors." Compl. ¶ 124. In other words, like in *Alltrista Plastics*, Qbex argues that Intel had a duty to help Qbex resolve the technical problems with the smartphones, including the overheating, even though the contract did not clearly outline the type of technical support that the parties contemplated. As a result, Qbex has adequately identified the implied obligation that it thinks should be read into the contract.

However, the Court must also assess whether this implied term reflects "the parties' reasonable expectations at the time of contracting," rather than a rewrite of the contract by a party who regrets the original terms. *See Nemec*, 991 A.2d at 1126. Based on the allegations in the complaint and the May 2016 emails, the Court concludes that Qbex has plausibly alleged that

26

Qbex's interpretation reflected "the parties' reasonable expectations at the time of contracting." In particular, the complaint alleges that Intel represented to Qbex that Intel "had several supervising technicians working directly at [the ODM] factories to ensure compliance with Intel's standards and designs" and that "whenever Qbex had any issue or question about the ODMs, Qbex could either ask Intel or ask the ODMs directly." Compl. ¶¶ 33, 52. When Qbex raised concerns about overheating with Intel in late 2015 or early 2016, Intel stated that it would review the issue with its ODM. *Id.* ¶ 69. When customer complaints began to increase in early 2016, Intel officials Souza and Pinheiro "work[ed] closely with Qbex to address the problem." Finally, an earlier May 2016 email among Intel officials, entitled "PENDING CASES QBEX – SOFIA PHONE TABLET," confirms that Intel was working at that time on an issue related to smartphone batteries as well as "resolution of the issues with the Sofia tablet" at "the Qbex plant." Exh. G at 6. The email stated that "these two processes . . . directly impact the pending cases involving the phones and tablets." *Id.* Taken together, Qbex has adequately pled that its alleged implied obligation regarding technical support reflects the parties' reasonable expectations at the time of contracting that Intel would continue to provide technical support to address any issues with the microprocessors. Finally, Qbex has adequately alleged that Intel breached this implied obligation and that Qbex suffered damages as a result. *See* Compl. ¶¶ 85, 124.

Accordingly, Intel's motion to dismiss the implied covenant claim as to the provision of technical support is DENIED.

**E.     Qbex May Proceed With Its Unjust Enrichment Claim in the Alternative to Its Contract Claims**

**1. The Parties' Arguments**

Qbex's sixth cause of action is for unjust enrichment. Qbex alleges that Intel has been enriched by Qbex's payments and Qbex has been impoverished by losing revenue as a result of the defective products. Qbex states that it lacks an adequate remedy at law to recover the funds that Intel received. Compl. ¶¶ 128-31.

Intel argues that where a contract governs the relationship between the parties, a plaintiff

27

cannot also state a claim for unjust enrichment. Mot. at 13-14. Alternatively, Intel argues that if Qbex seeks to plead an unjust enrichment claim in the alternative, Qbex "must show that the alleged contracts 'do not comprehensively govern the relationship between the parties with respect to' the allegations underpinning the unjust enrichment claim." *Id.* at 14 (quoting *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010)). Qbex responds that it is appropriate for Qbex to plead contract and unjust enrichment claims in the alternative. Opp. at 13-14. Intel replies that such pleading in the alternative is inappropriate here, where Qbex alleges several contracts governing the parties' relationship. Reply at 13.

### 2. Analysis

"The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec*, 991 A.2d at 1130. Delaware courts dismiss unjust enrichment claims where the parties' relationship is governed by contract because in those cases, contract law provides an adequate remedy. *See Air Prods. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 216 (D. Del. 2017) (holding that an unjust enrichment claim fails as a matter of law where a valid and enforceable contract governs the parties' relationship).

However, when there is doubt about the validity or enforceability of the contract, Delaware courts permit plaintiffs to plead unjust enrichment in the alternative where plaintiffs plead a factual basis for the unjust enrichment. *See, e.g.*, *James v. United Med. LLC*, No. N16C-06-209 AML, 2017 WL 1224513, at *7 (Del. Super. Ct. Mar. 31, 2017) (refusing to dismiss unjust enrichment claim were defendants also challenged enforceability of contract); *Khushaim*, 2016 WL 3594752 at *8 ("alternative pleading of this kind is generally only allowed 'when there is doubt surrounding the enforceability or the existence of the contract'" (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Nos. Civ.A. 762-N, Civ.A 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005))); *Furnari v. Wallpang, Inc.*, No. 13C-04-287 JRJ CCLD, 2014 WL 1678419, at *8-9 (Del. Super. Ct. Apr. 16, 2014) ("Quasi-contract claims may survive dismissal when pleaded

28

as an alternative to breach of contract, but such claims must be based upon independent factual bases."). For example, in *MIG Investments LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493 (D. Del. 2012), the court held that "Although Aetrex alleges the existence of an express contract, it appears to the Court that there is at least some dispute concerning this contract, particularly with regard to the meaning of certain terms. In light of this disagreement and given the early stage of the proceedings, the Court will allow Aetrex to proceed on its claim of unjust enrichment as an alternative theory to its breach of contract claim." *Id.* at 513.

Moreover, at least one court in the District of Delaware observed in the context of a motion to dismiss an unjust enrichment claim that it may not be appropriate for a federal court sitting in diversity to enforce "state law requiring that an election be made at the pleading stage, because a local practice of this type might cripple the flexible pleading provisions sanction[ed] by Rule [8(d)(3)] and defeat the overriding federal policy of having disputes determined on their merits." *Cavi v. Evolving Sys., Inc.*, 245 F. Supp. 3d 604, 605 (D. Del. 2017).

The Court declines to dismiss Qbex's unjust enrichment claim. In the instant motion, Intel is careful to argue that Qbex has alleged contracts that expressly govern the parties' relationship. *See, e.g.*, Mot. at 1 ("Qbex alleges the existence of a 'contractual relationship' with Intel relating to the supply of microprocessors, 'memorialized in a number of agreements' . . ."); *id.* at 12 ("Qbex . . . alleg[ed] that *express* contractual provisions required Intel to provide non-defective products and technical support"); Reply at 13 ("Qbex cannot dispute that it alleges such a contract; in fact, it alleges several."). But Intel itself has not conceded the interpretation or enforceability of these contracts. In fact, Qbex specifically sought an order setting the deadline for Intel to respond to Qbex's breach of contract claim after the Court rules on the instant motion to dismiss, *see* ECF No. 17, so the Court does not know at this time what challenges Intel may mount against the interpretation and enforceability of the alleged contracts, if any. Indeed, at the November 16, 2017 hearing, Intel represented that it had not yet determined its position on the enforceability or interpretation of the alleged contracts.

United States District Court
Northern District of California

In the instant motion to dismiss, Intel simply states that it will "litigate [Qbex's breach of contract and implied warranty of merchantability] claims vigorously on the merits." Mot. at 1. It is conceivable that Intel could successfully challenge the interpretation or enforceability of the contracts in a way that would still allow Qbex to succeed on an unjust enrichment claim in the alternative. *See James,* 2017 WL 1224513 at *7 (explaining situation where a plaintiff's contract claim fails but the alleged facts still support an unjust enrichment claim). Thus, given the potential for disagreement on the contract "and given the early stage of the proceedings," the Court DENIES Intel's motion to dismiss the claim for unjust enrichment. *See MIG Invs.*, 852 F. Supp. 2d at 513.

## F. Qbex's Civil Conspiracy Claim Must be Dismissed Because the Surviving Claims Cannot Support a Civil Conspiracy Claim

### 1. The Parties' Arguments

Qbex's seventh cause of action alleges a civil conspiracy between Intel, Rockchip, Water World, Fortune Ship, I-Swim, and HK Tianruixiang to violate Qbex's rights and commit intentional torts. Compl. ¶ 133. "Specifically, Intel conspired with the above ODMs in order to conceal the design defects of the SoFia microprocessors and to deceive Qbex into believing the defects would be fixed." *Id.* ¶ 134.

Intel argues that Delaware civil conspiracy must relate to an underlying tort. Mot. at 14. Because Intel argues that the torts should be dismissed, it concludes that the civil conspiracy claim should also be dismissed. *Id.* at 15. Qbex replies that its fraud claims survive, and that as a result its civil conspiracy claim should survive as well. Opp. at 15.

### 2. Analysis

"The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005). However, "civil conspiracy is not an independent cause of action in Delaware." *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998). A claim for civil conspiracy

30

must be premised on an underlying wrong that sounds in tort, not in contract. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) ("[U]nless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based; similarly, a claim for civil conspiracy cannot be predicated on a breach of the implied *contractual* covenant of good faith and fair dealing unless the breach also constitutes an independent tort."). Moreover, negligence alone cannot support a civil conspiracy claim—the tort must be intentional. *See Anderson v. Airco, Inc.*, No. Civ.A. 02C-12-091HDR, 2004 WL 2827887, at *4 (Del. Super. Ct. Nov. 30, 2004). "If the plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed." *Khushaim*, 2016 WL 3594752 at *9.

Thus, Qbex's civil conspiracy claim must be based on either its common law fraud claim or its DCFA claim. The Court has dismissed both of these claims, so Qbex's civil conspiracy claim must also be dismissed. Accordingly, Intel's motion to dismiss the civil conspiracy claim is GRANTED. However, because the Court granted leave to amend the common law fraud claim, the Court also grants Qbex leave to amend its civil conspiracy claim if it chooses to amend its common law fraud claim.

### G. Attorneys' Fees, Treble Damages, and Punitive Damages

Finally, Intel moves to dismiss Qbex's prayers for attorneys' fees, treble damages, and punitive damages because Qbex's surviving causes of action do not provide a basis for these types of relief. Mot. at 15-16. First, Qbex conceded in its opposition that "there is no present basis for attorneys' fees" but reserved the right to reassert its prayer for attorneys' fees if it could develop a basis for such a claim. At the hearing on November 16, 2017, Qbex explained that it could not rule out the possibility that one of its contracts with Intel contained a fee-shifting provision. Accordingly, Intel's motion to dismiss the prayer for attorneys' fees is GRANTED with leave to amend.

Next, as to treble damages, at the hearing on November 16, 2017, Qbex conceded that it

31

United States District Court
Northern District of California

does not object to the dismissal of its prayer for treble damages. Accordingly, Intel's motion to dismiss the prayer for treble damages is GRANTED with prejudice.

Finally, because the Court dismissed the common law and statutory fraud claims, Intel's motion to dismiss Qbex's prayer for punitive damages is also GRANTED. However, because the Court granted Qbex leave to amend the common law fraud claim, the Court also grants Qbex leave to amend its prayer for punitive damages if it amends its common law fraud claim.

## IV.   CONCLUSION

For the foregoing reasons the Court GRANTS IN PART and DENIES IN PART Intel's motion to dismiss six of Qbex's eight causes of action and certain of Qbex's prayers for relief. Specifically:

- Intel's motion to dismiss the first cause of action for common law fraud is GRANTED with leave to amend;

- Intel's motion to dismiss the second cause of action for violation of the Delaware Consumer Fraud Act is GRANTED with prejudice;

- Intel's motion to dismiss the third cause of action for negligent misrepresentation is GRANTED with leave to amend;

- Intel's motion to dismiss the fifth cause of action for breach of the implied covenant of good faith and fair dealing is DENIED without prejudice to Intel renewing its motion as to the obligation to provide non-defective products and DENIED as to the obligation to provide continued technical support;

- Intel's motion to dismiss the sixth cause of action for unjust enrichment is DENIED;

- Intel's motion to dismiss the seventh cause of action for civil conspiracy is GRANTED with leave to amend;

- Intel's motion to dismiss the prayer for attorneys' fees is GRANTED with leave to amend;

32

- Intel's motion to dismiss the prayer for treble damages is GRANTED with prejudice;

- Intel's motion to dismiss the prayer for punitive damages is GRANTED with leave to amend.

Qbex shall file its amended complaint, if any, within 30 days. If Qbex fails to file an amended complaint within 30 days or fails to cure the deficiencies identified in this order, the claims dismissed in this order will be dismissed with prejudice. Qbex may not add new causes of action or new parties without a stipulation or leave of the Court.

Furthermore, if Qbex amends its complaint and Intel files a motion to dismiss the amended complaint, the Court HEREBY ORDERS Intel to answer any claims that it does not move to dismiss simultaneously with its motion to dismiss the amended complaint. For the reasons stated on the record at the November 16, 2017 hearing, the Court finds that the claims in this case are sufficiently intertwined that it is necessary to know Intel's answer to all claims in order to rule on any motion to dismiss an amended complaint. This ruling supersedes the Court's Order Granting Defendant's Administrative Motion to Set Deadline for Response to Plaintiff's Complaint, filed on August 15, 2017. ECF No. 20.

**IT IS SO ORDERED.**

Dated: November 17, 2017

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 17-CV-03375-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SIX OF EIGHT CLAIMS FOR RELIEF AND CERTAIN PRAYERS FOR RELIEF

United States District Court
Northern District of California